THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CURTIS NELSON *et al.*, Defendants-Appellants.

First District (5th Division)    No. 80-0063

Opinion filed May 21, 1982.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant Curtis Nelson.

Tatel, Levy & Howlett, of Chicago, for appellant Gregory Blocker.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Barry A. Gross, Marcia B. Orr, and Richard J. Burke, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial defendants were found guilty of 2 counts of armed robbery and 2 counts of unlawful restraint. (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2, 10—3(a).) Both were sentenced to concurrent prison terms of 20 years on each armed robbery count and 3 years on each count

of unlawful restraint. On appeal, defendants argue that (1) they are entitled to a new trial because of defense counsel's failure to use available impeaching and alibi evidence and (2) their sentences are excessive and should be reduced, or, alternatively, a new sentencing hearing must be conducted at which the trial court must specify the reasons that led to its sentencing determination. We affirm the convictions but reduce the sentences.

In October of 1977, defendants Nelson and Blocker were arrested and charged with armed robbery and unlawful restraint. A jury trial in September 1978 ended in a mistrial when the jury was unable to reach a verdict. In November 1979, a second jury trial began and the following evidence was adduced.

Joseph Woodward testified that at 11:50 p.m. on the night of October 14, 1977, he and a co-worker from the Illinois Masonic Hospital were in his car at 51st and Halsted. Woodward had pulled over to the curb and his co-worker, O. T. Ford, began to get out of the car. Two black males, later identified as defendants, walked up with a gun and pointed it at Ford, saying "This is a stick-up." Woodward testified that defendant Nelson was the one who held the gun. He further testified that when he got out of the car Nelson held the gun on Ford. Nelson told Woodward not to run or he would kill him. All four men got into the car and Nelson told Woodward to drive down 51st Street onto the Dan Ryan Expressway. He said he did not intend to rob them but had to get out of the neighborhood. At Nelson's order, Woodward then exited from the expressway and drove to an alley where defendants searched Woodward and took his money, about $7. Afterward they drove around for a short period of time while Blocker held the gun on Woodward and Ford. Nelson then stopped the car on the shoulder of the expressway and told Ford to "hit the grass." Ford crawled through the weeds and bushes adjacent to the expressway. Shortly thereafter, defendants released Woodward and drove off in his car. Woodward testified that the entire incident had lasted approximately 45 minutes.

Testifying further, Woodward stated that he and Ford called the police from a service station, after the incident. When the police arrived, Woodward explained what had happened and described his car and the two assailants. The police transmitted the descriptions over their radio at approximately 1:10 a.m.

Officer Vereecken testified that while he was on patrol at about 3:30 a.m. on October 15, 1977, he noticed a vehicle that matched the description of Woodward's car. He and his partner, Officer Kovac, stopped the car and noticed that there were two males, whom he identified in court as defendants, and three females. He advised the men of their rights and

searched them, finding $50 on Nelson. He also discovered a fully loaded .357 revolver under the seat of the passenger's side of the car.

At 4 a.m. the police telephoned Woodward and asked him to view a lineup at the station. He and Ford separately viewed a six-man lineup. They both identified two men, defendants, as their assailants. In the parking lot at the station, Woodward saw his vehicle.

Next to testify was the police investigator who had conducted the lineup. He described the procedures and circumstances surrounding the lineup.

An assistant State's Attorney, Brian Collins, then testified as to his presence in an interview room with defendant Blocker in the early morning of October 15, 1977. Collins advised Blocker of his *Miranda* rights from memory. Blocker indicated that he understood them and then admitted that he had committed a robbery in the vicinity of 51st Street and Halsted. He said he had taken $10. When a police officer came into the interview room with a gun, defendant identified it as the gun he used in the robbery. Collins testified further that he did not ask Blocker to sign a written statement. Collins later used his own notations to write a summary of Blocker's statement, but it was not read or signed by Blocker. Collins also testified that it is not normal procedure to attempt to procure a written statement except in homicide cases.

Ford then testified. His account of the occurrence was substantially the same as Woodward's. He stated that defendants took approximately $50-60 from him. In his initial description to the police he reported that Nelson was tall, dark, 160-170 pounds, about 26, and wore a goatee. He identified a photograph of the lineup and testified that he was able to identify defendants because they were still wearing the same clothes.

After the admission of its exhibits the State rested and defendant's motion for a directed verdict was denied.

Charles Stewart, an unemployed carpenter, then testified for the defense. On October 14, 1977 at 8:30 or 9 p.m. he attended a party at a lounge with defendants and a man named McGowan. He recalled defendants being with him in the lounge from midnight until 1 or 1:30 a.m. He remained in the lounge until closing time, approximately 2:30 or 3 a.m., helping McGowan straighten up while defendants waited outside in the parking lot. Stewart further testified that when he left the lounge he saw them in the parking lot talking to a couple of girls. While they were sitting in the car and talking, a car pulled up to the curb and the driver called out for Blocker. Stewart testified that he did not know what was said then but he saw Blocker, Nelson and the girls get into the car and drive away.

On cross-examination, Stewart testified that he was a friend of

defendants. He did not recall Nelson having a goatee on October 14 and 15, 1977, or what type of clothing he wore, except for a black hat and brown jacket. He doubted that Blocker had a mustache and had never known him to have a suede jacket. He admitted that he had never gone to tell the police that he was with defendants on that night.

Following Stewart's testimony, both sides rested. The jury then heard closing arguments and were instructed on the law, after which they found defendants guilty as charged on 2 counts each of armed robbery and unlawful restraint. Defendants, who each had one prior conviction, were thereafter sentenced to concurrent prison terms of 20 years on each armed robbery count and 3 years on each count of unlawful restraint.

OPINION

I

Initially defendants argue that they were denied effective assistance of counsel in violation of their right to due process of law under the fourteenth amendment to the United States Constitution. They contend that their attorney failed to impeach complainants' identification testimony with their prior inconsistent descriptions and failed to produce a defense witness for the second trial whose testimony would have "unequivocally" established their alibi defense. Therefore, because of the importance of this evidence to their defense that they were victims of mistaken identity, defendants request that their convictions be reversed and the case remanded for a new trial. We reject these contentions.

■■ Under Illinois law a defendant is entitled to a new trial if he can establish his counsel's actual incompetence "as reflected by the manner of carrying out his duties as a trial attorney which results in substantial prejudice without which the outcome would probably have been different." (*People v. Carlson* (1980), 79 Ill. 2d 564, 584-85, 404 N.E.2d 233; accord, *People v. Talley* (1981), 97 Ill. App. 3d 439, 422 N.E.2d 1084.) Substantial prejudice is not established by mere conjecture or by second-guessing counsel's trial tactics. (See *People v. Bell* (1981), 95 Ill. App. 3d 803, 420 N.E.2d 497.) Furthermore, competency is generally determined from counsel's overall performance during the course of trial. *People v. Bell.*

We adhere to these principles as being the established law of Illinois. Although defendants urge us to replace the actual incompetence/substantial prejudice standard with a "minimum standard of professional representation" test espoused in various Federal cases (*e.g., United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634), we note that the Illinois Supreme Court has rejected that standard. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; see also *People v. Greer* (1980), 79

Ill. 2d 103, 402 N.E.2d 203.) We therefore decline to adopt the standard and express no opinion as to its relative merits.

On the issue of counsel's failure to use impeaching evidence at the second trial, defendants enumerate several discrepancies in complainants' descriptions of their assailants. They contrast the victims' descriptions given to the investigating police officer with the descriptions given at trial. In the first trial, which ended in a mistrial, the police officer called by the defense had testified as to the following descriptions he received from the victims: one offender (later identified as Nelson) was dark complected, had a goatee, was 5'7", 180 pounds, age 27. No clothing description was indicated. The other assailant (Blocker) was described as light complected with a mustache, 5'6", weighed 165 pounds, age 22, who wore a brown shirt and brown suede jacket. Ford testified at the first trial that he remembered Nelson as wearing a brown turtleneck sweater and that Blocker was wearing light brown pants and a shirt, but admitted to having testified at a prior hearing that Nelson wore a reddish sweater and maroon shirt and had no facial hair. He explained that he was confused at the preliminary hearing and had made a mistake.

Defendant Nelson testified at the first trial that when he was arrested he was wearing a dark green turtleneck sweater and red slacks with a blue pinstripe while Blocker wore rust colored pants and a beige sweater with a ship design on the bottom. There was also a lineup photograph introduced into evidence that showed defendants in the clothes they were wearing at the time of arrest. Nelson further testified that he had a large scar on his forehead, two near his eye and one on his nose.

At the second trial, Woodward identified defendants as his assailants and then testified that he initially described Nelson to the police as being 5'11" tall, 180 pounds, having a goatee, and wearing a brown turtleneck sweater, while Blocker was 5'6", 165 pounds, with a black mustache, wearing a sweater with a design on it and a brown suede jacket. Ford testified that he had described Nelson as tall and dark, 160-170 pounds, 26 years old, wearing a goatee. He further stated that he could identify defendants in the lineup because they were still wearing the same clothes.

In summary, the main discrepancies involve Nelson's height, the assailants' clothing, and the victims' failure to mention scars on Nelson's face. The officer's testimony indicated that the taller offender was estimated as being 5'7", while Woodward testified at the second trial that defendant was 5'11". We do not think that this four-inch difference, under all the circumstances, is enough to raise a reasonable doubt as to defendants' identity. The officer had admitted to being "a little rushed" when filling out his report and it is not inconceivable that he might have

incorrectly transcribed complainant Woodward's estimate of Nelson's height. Moreover, a crime victim's failure to accurately guess a person's height and weight is rarely fatal to that victim's otherwise positive identification of a defendant. (*People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174.) Here, both victims had the opportunity to view defendants during their 45 minutes in captivity. See *People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.

Similarly, we do not believe that the absence of a detailed clothing description in Officer Rydell's report is a "discrepancy" or raises a reasonable doubt as to the assailants' identity. Both victims, separately, selected defendants out of the lineup shortly after the arrest and within a few hours of the incident. This positive identification along with the in-court identifications are not seriously undermined by the inability of complainants to remember precisely what they told the officer or whether they remembered the color of Nelson's turtleneck as being "reddish" or brown when it was actually dark green. Furthermore, the jury was shown the lineup photograph at the second trial and could compare it with the victims' testimony as to their recollection of the assailants' clothing.

With respect to the victims' failure to observe or report any facial scars that defendant Nelson claimed to have, we note that, again, the jury would have been apprised of any scars by viewing Nelson during the trial. ■■ Defendants, however, emphasize that they were prejudiced by defense counsel's failure to use the above discrepancies to impeach the State's witnesses at the second trial; they argue that the jury was deprived of Officer Rydell's testimony and of Ford's inconsistent statements made at the preliminary hearing. We do not believe, however, that this failure to use impeaching evidence constitutes incompetency. In *People v. Horton* (1964), 30 Ill. 2d 293, 196 N.E.2d 649, our supreme court rejected an argument that defense counsel was incompetent because he failed to put before the trial court a witness' testimony at a preliminary hearing that supposedly contradicted his trial testimony. The court simply noted that it did not find "any necessary inconsistency" between the witness' testimony at a preliminary hearing and his trial testimony. In the present case, as we have noted, some inconsistencies exist. However, as we have discussed, they are either minor, such as the color of Nelson's sweater, or were brought to the jury's attention indirectly, as in the matter of the visibility of Nelson's facial scars. We do not find that, overall, the identification evidence in the second trial varies substantially from that adduced at the first. While it may have been a preferable strategy to bring out every possible discrepancy to the jury, the law has long been established that a party is not entitled to a perfect trial. (*E.g., People v. Greer* (1980), 79 Ill. 2d 103, 121, 402 N.E.2d 203.) We do not believe that defense counsel's

failure to pinpoint every inconsistency amounted to "actual incompetence" under the applicable standard.

Moreover, such acts of incompetency must be of the type that probably changed the outcome of the trial. Of course, in particular cases the test may be difficult to apply. In the present case, however, the record reveals that defense counsel vigorously cross-examined the complaints as to each phase of the crime. The defendants were positively identified by Ford and Woodward, who had ample opportunity to observe their assailants during the 45 minutes that they were in the car with them. A conviction may be supported by the credible testimony of a single witness (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631), and we do not agree that, given the evidence in this case, the jury would probably have reached a different verdict had defense counsel used the transcript from the prior trial in an attempt to impeach the State's witnesses.

■■ As to the second alleged instance of counsel's incompetency, defendants refer to his failure to call Robert McGowan as an alibi witness at the second trial or at least to offer his prior testimony (from the first trial) into the record at the second trial. Because the decision whether or not to call a witness is generally viewed as a tactical one, it is improper for us to speculate as to counsel's judgment in not calling McGowan at the second trial. (*People v. Elder* (1979), 73 Ill. App. 3d 192, 203, 391 N.E.2d 403.) Defendants' alternative argument, that counsel should have offered McGowan's prior trial testimony, overlooks the evidentiary question of its admissibility. As an exception to the rule against hearsay, former testimony that is offered for the purpose of proving the facts testified to is admissible only if the witness is unavailable. (McCormick, Evidence sec. 254, at 614-15; sec. 253, at 608-13 (2d ed. 1972); see also Fed. R. Evid. sec. 804(b)(1) (1975).) The record in the present case is silent as to McGowan's availability to testify at the second trial. Thus, if he were available and counsel chose not to call him for tactical reasons,[1] counsel would be unable to offer the prior testimony instead. We cannot presume that trial counsel used incorrect strategy in this instance and we therefore hold that his failure to present McGowan's testimony to the second trial's jury was not necessarily incompetency. Moreover, since defendants presented their alibi defense at trial through the testimony of Charles Stewart, we conclude that they were not substantially prejudiced; McGowan's testimony would have been only cumulative. Consequently, trial counsel's alleged failings do not rise to the level of reversible error and we find that defendants were not denied a fair trial.

---

[1] Defendants apparently assume there could be no sound reason not to call a witness at a second trial whose testimony at the first trial was favorable to defendant; however, a witness could conceivably change his story or otherwise be an unattractive witness at a later trial.

## II

Defendants next argue that their sentences should be reduced, or, in the alternative, the sentences should be vacated and a new sentencing hearing granted in which the trial judge must specify the reasons that led to his sentencing determination. The State responds that defendants' sentences were within the statutory guidelines; armed robbery, a Class X felony, is punishable by 6 to 30 years (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2(b), 1005—8—1(a)(3)) and unlawful restraint, a Class 4 felony, is punishable by 1-3 years (Ill. Rev. Stat. 1979, ch. 38, pars. 10—3, 1005—8—1(a)(7)).

The Illinois Supreme Court has recently reaffirmed the standard for reviewing sentences on appeal as whether the trial court abused its discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) Generally we will not disturb a sentence on review unless it greatly diverges from the purpose and spirit of the law or is highly disproportionate to the nature of the offense. (*People v. Gibbs* (1977), 49 Ill. App. 3d 644, 364 N.E.2d 491.) We noted in *People v. Gibbs*, however, that there were some "cases which call for this court to reduce the sentence which has been imposed even when such sentences are within the statutory limits." (49 Ill. App. 3d 644, 648, 364 N.E.2d 491, 494.) Penalties are to be determined according to the "seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, sec. 11; see *People v. Gibbs*.) Although the trial court's sentencing determination is not to be lightly set aside we have not hesitated, when appropriate to reduce sentences. See *People v. Gibbs* (sentences of 50-100 years reduced to 15 to 45 years); *People v. Kosanovich* (1979), 69 Ill. App. 3d 748, 387 N.E.2d 1061 (armed robbery sentence of 10-15 years held to be excessive and case remanded for resentencing); *People v. Huffman* (1979), 78 Ill. App. 3d 525, 397 N.E.2d 526 (concurrent sentences of 4 years for 2 counts of burglary, 3 years for criminal damage to property and 1 year for possession of a stolen vehicle reduced to 4 years' probation with a condition of 3 months' imprisonment), *c.f. People v. Hayes* (1979), 70 Ill. App. 3d 811, 388 N.E.2d 818 (court affirmed a 75-100 year sentence for murder despite 20-year-old defendant's argument that the 75-year minimum would crush his incentive to improve himself in prison because there was no evidence or background information to indicate defendant's rehabilitative potential).

The following facts in mitigation and aggravation were presented at defendant's sentencing hearings.

Defendant Blocker, who was 20 years old at the time of sentencing, had been placed on 2 years' probation for the offense of felony theft but had no other convictions. He had attended high school for four years but was arrested before graduation. He had also worked part-time for four

years at his father's business. The probation officer who prepared his presentence investigation report indicated the possibility that he could be referred to a program for ex-offenders where he could receive job counselling and assistance in obtaining his G.E.D.

Curtis Nelson, 26 at the time of sentencing, also had only one prior conviction in 1973 for interference with a police officer. He had received one year probation. Nelson, unmarried, is also the father of three young children by the same mother. Although he dropped out of high school, he had been employed 4 years as a car hiker and 1½ years as the manager of a shop owned by his fiancee's father. He also expressed a desire to enter a job training program in order to upgrade his employment situation.

We note that defendants did not physically harm the victims. (See Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.1(a)(1).) Moreover, both defendants' single prior convictions, while relevant as to sentencing, were not for violent crimes and resulted in probation. Most important, perhaps, we believe that the defendants in this case have rehabilitative potential that would not be well served by the length of their sentences. In *People v. Kosanovich* we observed that the defendant's term of 10-15 years imprisonment for armed robbery was excessive despite the fact that the defendant had robbed an art gallery owner at gunpoint and knifepoint and had twice threatened to kill him during the robbery. She also had tied the victim up and forced him to lie face down in a back room. The court noted that these acts indicated a threat of force but nevertheless concluded that a minimum sentence higher than 10 years would serve no useful purpose in light of defendant's age (28), rehabilitative potential and need for health care. She had had an unstable home life, was a high school dropout and had been discharged from two jobs. She also had convictions for possession of marijuana and heroin and unlawful use of a weapon.

■■ While defendants' conduct in this case unquestionably posed a serious threat to the victims, we believe that the particular factors in mitigation enumerated above inveigh against the imposition of 20 year sentences for armed robbery. In light of defendants' ages, prior scholastic records, work histories, and criminal records, we find that defendants' sentences are excessive. Therefore, we reduce the armed robbery counts to 10 years but leave undisturbed the 3-year sentences for unlawful restraint, all to run concurrently.

Because of our disposition of the sentencing issue we do not reach defendants' alternative argument, that the trial court should have given the reasons it considered in arriving at the sentencing determination. (See Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1(c).) Defense counsel failed to object or to request the court to comply with section 1005—4—1(c) and we express no opinion as to whether the plain error rule would otherwise permit us to reach the merits of this issue.

For the reasons contained herein we affirm defendants' convictions but reduce their sentences on the armed robbery counts from 20 years to 10 years.

Affirmed as modified.

SULLIVAN, P. J., and LORENZ, J., concur.