THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
NATHANIEL SINGLETON, Defendant-Appellant.

First District (5th Division)   No. 83—120

Opinion filed May 25, 1984.

Steven Clark and Elizabeth Clarke, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jane E. Liechty, and Neil J. Linehan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON* delivered the opinion of the court:

Following a jury trial, defendant was found guilty of deviate sexual assault, aggravated kidnaping and two counts of armed robbery (Ill. Rev. Stat. 1981, ch. 38, pars. 11—3, 10—2 and 18—2, respectively), and sentenced to concurrent prison terms of 25 years for each offense. On appeal, defendant argues that: (1) the trial court erred in instructing the jury on aggravated kidnaping predicated upon secret confinement when the charging document alleged aggravated kidnaping predicated upon intent to secretly confine; (2) the 25-year sentence for the offense of aggravated kidnaping without a ransom, a Class 1 felony (Ill. Rev. Stat. 1983, ch. 38, par. 10—2(b)(2)) exceeds the statutory limitation set forth in section 5—8—1(a)(4) of the Unified Corrections Code (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(4)); (3) the trial court improperly based defendant's sentence on his refusal to admit his guilt; and (4) the concurrent sentences of 25 years were excessive in light of defendant's excellent prior record. For the reasons that follow, we affirm all convictions, affirm the sentences for deviate sexual assault and armed robbery, and reduce the sentence for aggravated kidnaping.

Testimony at trial disclosed three versions of the events leading up to defendant's arrest in the early morning of April 25, 1982: (1) the State's version presented by the two complainants and the arresting officers; (2) the defendant's version; and (3) the impeachment version presented by a rebuttal witness for the State.

STATE'S VERSION

The female complainant, D.H., testified that approximately 2:45 a.m. on April 25, 1982, she left her home near 21st and Pulaski in Chicago to pick up her live-in boyfriend, R.K., who had just finished work as a bartender at a nearby lounge. On the way home, D.H. and R.K. stopped at a carryout restaurant to pick up some ribs and beverages to take home. Upon arriving home and parking the car in the vacant lot next to her house, D.H. noticed a male walking toward the car. When she and R.K. exited from the car, the male shouted, "Halt!" and they turned around and saw a gun "staring us in the face." At trial, D.H. identified defendant as the man with the gun and further identified the gun previously introduced into evidence by the State as the weapon defendant had been holding that night.

Defendant told D.H. and R.K. to walk back to the car and then

---

*This opinion was prepared by the late Mr. Justice Wilson and was adopted and filed as the opinion of the court.

demanded their money. He took R.K.'s money first and when D.H. handed him only paper currency, defendant said, "B----, I said give me all the money," and clicked his gun. When R.K. heard the gun click, he turned around to see what was happening and defendant struck him in the head with the gun, causing a laceration on the right side. Defendant then told D.H. to unlock the trunk of the car and ordered R.K. to climb inside. When R.K. took his time moving items in the trunk, defendant threatened to blow his brains out if he did not hurry.

Once R.K. was locked into the trunk, defendant led D.H. to the driver's side of the car at gunpoint, ordered her to get inside, then ran around to the passenger's side. D.H. stated that she was going to lock the automatic door locks and leave, but defendant ran around to the passenger side too fast and had the gun pointed at her from the other side of the car window. He then got into the car, and with the gun pointed at her, told her to drive to the lakefront.

When D.H. backed the car into the alley, defendant told her to stop the car and unzip her pants, take her right leg out of her pants, and pull down her undergarments. Then, while keeping the gun pointed at her chin, he performed cunnilingus on her. When D.H. asked defendant what he was going to do with her and R.K., he said he was going to kill R.K., rape her, and then knock her out.

As they were driving to the lakefront, defendant scooted down in the front seat and, while holding the gun in his right hand, aimed at D.H.'s side, he started fondling her breasts. As he was doing this, he lost concentration on the gun and, although it was still in his hand, it was practically lying on the seat. When D.H. stopped at the stop sign at Cullerton and Pulaski, she noticed a police squad car coming down the street. She drove away from the stop sign slowly, waiting for the squad car to get closer, and then ran a stoplight to get their attention. D.H. then grabbed for the gun and began struggling over it with defendant. Finally, D.H. let go of the steering wheel, lunged for the gun, opened the door and fell out of the car while it was still moving. By this time the squad car had its spotlight on the car and D.H. began yelling to the police, "This guy is trying to rape me and I got the gun, and my boyfriend was [sic] in the trunk." The car eventually ran up over the curb, hit a fire hydrant and light pole and came to a stop. By then, the police had exited their squad car, and were standing behind the car doors with weapons drawn. One of the officers took the gun from D.H. and told her to put her clothes on in the squad car. While in the squad car, D.H. saw the police officers approach her car and also saw defendant fall out of the passenger door to the ground. The police released R.K. from the trunk, took D.H. home so that she

could change her clothes, then drove both D.H. and R.K. to the police station.

On cross-examination, D.H. stated that she has been dating R.K. exclusively for four years and that he would be very upset if she dated others. R.K. works part-time Friday, Saturday and Sunday evenings as a bartender until 3 a.m. on Friday, 2 a.m. on Saturday, and midnight or 1 a.m. on Sunday. While R.K. is bartending, D.H. stays home with her four children. D.H. also testified that she does not drink alcoholic beverages, had never seen defendant prior to the night of the incident, and had never seen R.K. with a gun. Further, D.H. denied: (1) having ever been in the Texas Lady Lounge at 21st and Pulaski; (2) knowing Rosie Hill, defendant's girlfriend; (3) having seen either Tommy Strong, defendant or Rosie Hill the week prior to the incident; (4) telling defendant that she wanted to get rid of R.K.; (5) having any insurance on R.K.; (6) voluntarily pulling down her pants; and (7) having previously had sex with defendant.

Next, R.K. testified to substantially the same events leading up to his confinement in the trunk. In addition, he stated that while in the trunk, he felt the car initially move backward, stop for a minute or two, start up again, move forward and then begin to weave back and forth. He then heard D.H. scream just before the car came to a crashing halt. When he heard more voices, he started banging on the trunk and a police officer opened it. At trial, R.K. identified the gun used by defendant and stated that he had never seen either the gun or defendant prior to the incident. On cross-examination, R.K. further stated that he saw money change hands between defendant and D.H.

Next, Daniel Rosas, Chicago police officer, testified that on the morning of April 25, 1982, while driving northbound on Pulaski near 19th Street with his partner, William Marose, he observed a silver-colored Oldsmobile go through a red light, and then begin to move erratically from side to side. When he directed the emergency lights and spotlight on the Oldsmobile, he could see two people in the front seat apparently struggling. Suddenly, while the Oldsmobile was still moving, the female driver jumped out of the car, holding a revolver in her hand. One of her legs was completely out of her slacks and she was screaming hysterically that the passenger had a gun and had tried to rape her. The Oldsmobile then ran up over the curb, hit a fire hydrant or light pole and came to a stop. Rosas observed a black male exit from the passenger side, take a couple of steps, then intentionally fall to the ground when he saw the police. At trial, Rosas identified defendant as the man who had exited from D.H.'s car.

As Rosas approached defendant with his gun drawn, defendant

said, "Okay, I'm cool. I got the money in my back pocket." Marose then handcuffed defendant, and took the money out of defendant's back pocket. Meanwhile, Rosas heard pounding coming from the trunk and D.H. told him that her boyfriend was in there. While the back-up unit took defendant into custody, Rosas and Marose drove D.H. home so that she could change her clothes and they could inventory what she had been wearing. They then took D.H. and R.K. to the police station.

Next, William Marose, Chicago police officer and Rosas' partner on the night of the incident, corroborated Rosas' testimony, identified defendant as the passenger and further testified that while D.H. was changing her clothes, he walked through the vacant lot next to her house and observed some food that looked like chicken or ribs lying on the ground. He inventoried the money taken from defendant and the six-inch .37 magnum taken at the scene. At trial, Marose identified the gun, the five live rounds recovered from the gun, photographs of the scene of the accident, and a photograph of defendant taken on the night of the arrest.

At the conclusion of the State's case, defendant's motion for a directed finding was denied.

DEFENDANT'S VERSION

Defendant testified that he originally met D.H. on March 1, 1982, at a neighborhood grocery store. At that time, she told him that she frequently visited the Texas Lady Lounge and the Sheba Lounge. The following weekend, defendant saw D.H. at the Texas Lady, bought her a beer and they talked until approximately 1:30 a.m. when they left in D.H.'s car to go to a motel. This was the general pattern for four subsequent "dates" within the period from early March to the night of the incident. Because defendant was unemployed, D.H. would frequently give him money and she always registered and paid for the motel rooms herself. On one occasion, when D.H. did not have enough money to pay for the room, she and defendant had sexual intercourse in D.H.'s car, a silver Oldsmobile. Defendant stated that although he and D.H. were sexually attracted to each other and both were unmarried, they continued to meet secretly because each had a personal commitment to another person who would be very upset if their relationship were discovered. Despite their attempt at secrecy, however, defendant's girlfriend, Rosie Hill, walked into the Texas Lady Lounge one weekend night and saw defendant and D.H. embracing. Hill became furious, but defendant cooled her down and took her home before an actual physical altercation took place.

Defendant further testified that the week prior to the incident, D.H. and defendant made plans to meet at the Texas Lady Lounge on April 24. That night he arrived at the lounge approximately 11 p.m. and waited for D.H. until the lounge closed approximately 3:30 a.m. When defendant left the lounge and started walking toward D.H.'s house, he saw her standing by herself on 21st Street. She told him that she had been detained, but that she would get in touch with him the next day and arrange a time when they could get together. When defendant turned to leave, R.K. came running from the vacant lot next to D.H.'s house, carrying a gun similar to the one admitted into evidence. Pointing the gun at them, R.K. accused D.H. of having an affair with defendant. While D.H. was explaining that they were just friends, defendant kicked the gun out of R.K.'s hand and grabbed him. D.H. picked up the gun. As soon as D.H. had the gun in her control, defendant released R.K. and started to walk away, assuming D.H. could handle the situation herself. When he turned back to look at them, defendant saw R.K. jump at D.H., at which point she swung the gun and hit R.K. in the right side of the head. D.H. then directed R.K. into the vacant lot at gunpoint and opened the trunk of the Oldsmobile. Defendant continued to walk away and did not see D.H. force R.K. into the trunk. When he saw her open the trunk, he thought she was just going to put the gun inside. As defendant approached the corner of 21st and Pulaski, D.H. pulled up to the curb in the Oldsmobile, honked the horn, and motioned defendant into the car. She was by herself. After he got in, she pulled the car into a nearby alley, turned it off and asked him if he wanted to have sex. When he agreed, she handed him some money and started to remove her pants. At this time, defendant did not know that R.K. was in the trunk.

While defendant was removing his clothes, D.H. told him that the money was an advance payment for defendant to shoot R.K. who was in the trunk. When defendant refused to do it, D.H. said that she would make it worth his while because she would be receiving insurance money and would have access to other money as well which was currently unavailable to her. When defendant told her that she was crazy and started to put on his clothes, D.H. started the car and sped off. She had not even pulled up her pants. Defendant told D.H. that he was going to jump out of the car the first time that she stopped, but she never did. Instead, she ran through both a stop sign and stop light. Defendant tried to grab the steering wheel and did manage to get the car to the right side of the road when suddenly D.H. grabbed the gun from under the seat and jumped out of the moving car. The car ran up over the curb and came to a stop next to a light pole.

Defendant squeezed out of the passenger door and took a few steps toward a police officer who pulled out his gun and ordered defendant to lie down on the ground. When he tried to talk, the police officer told him to shut up or he would "blow his brains out." A second police officer handcuffed him, searched him and took the money D.H. had given him. When R.K. was released from the trunk, he ran over to defendant and kicked him in the face. One of the officers then hit defendant on the forehead with a hard object, causing a wound that required six stitches. Defendant denied owning a gun and further denied ever having had oral sex with D.H.

During cross-examination, defendant stated that he did not recall an officer named Detective Rave and did not recall telling Rave that on the night of April 24, he had met D.H. at the Texas Lady Lounge early in the evening and arranged to meet her later at her house. Further, he did not recall telling Rave that he had put R.K. in the trunk and that D.H. voluntarily unzipped her pants and told him to perform oral sex. Defendant also claimed that while he was in jail the morning of his arrest, he was dizzy and kept passing out from his head wound that continued to bleed although it had been stitched and bandaged. The State then showed defendant photographs taken of him while in the cell which did not indicate that defendant's head wound was bleeding through the bandages.

Rosie Hill, defendant's girlfriend and mother of his two children, testified that prior to her appearance in court, she had seen D.H. twice and would never forget her face. Hill saw her the first time two weeks prior to the incident at the Texas Lady Lounge approximately 10 p.m. Hill had gone to the lounge looking for defendant and saw D.H. sitting on defendant's lap, hugging and kissing him. Hill was furious and was about ready to start a fight when defendant took her home. The following weekend, Hill saw D.H. standing in front of the Texas Lady Lounge talking to defendant. When defendant saw Hill, D.H. left.

After the defense rested its case, the State recalled R.K. to the stand as a rebuttal witness. R.K. stated that D.H. was not a beneficiary on any of his insurance policies and that he had no large sums of money in the bank, nor did he have any joint bank accounts with D.H. Further, defendant, not D.H., was the one who had hit him on the head and forced him into the trunk.

D.H. also testified as a rebuttal witness that she does not own any life insurance policies on R.K. and does not know of any policies on R.K.'s life that name her as beneficiary.

IMPEACHMENT VERSION

Detective Edward Rave of the Chicago police department testified in rebuttal that when he interviewed defendant at police headquarters immediately following his arrest, defendant told him that he met "the girl" approximately two or three weeks earlier at a lounge and saw her again at the lounge on the night of April 24, approximately 8 p.m. At that time, they arranged to meet later at her house. Approximately 2 a.m., when defendant met D.H. in her backyard, he saw a male pull up in front of her house, stop for a second, drive away, and then return a short time later. While they were in the backyard, D.H. asked defendant to kill her boyfriend, explaining that she would pay him from the insurance proceeds. D.H. and defendant then walked to the front of the house where defendant took money from both D.H. and R.K. and forced R.K. into the trunk. D.H. and defendant then got into the car where D.H. unzipped her pants and asked defendant to perform oral sex. When they had been driving a short distance, and defendant told D.H. that he would not kill R.K., she became furious and "piled the car into a barricade." Defendant told Rave that the gun belonged to D.H. Throughout the interview, defendant consistently referred to D.H. as "the girl," and never mentioned either her or R.K. by name. When Rave asked defendant what "the girl's" name was, defendant replied, "You know it." At trial, Rave identified defendant as the man he had interviewed on the morning of April 25, 1982.

Following closing arguments and jury instructions, the jury returned its verdicts of guilty, and the court granted the State's motion to revoke bond.

At the sentencing hearing, the trial court denied defendant's motion for a new trial and heard testimony in mitigation from defendant's girlfriend, his mother, a former employer and a niece. Following further argument by both counsels as well as a statement by defendant, the trial court sentenced defendant to concurrent terms of 25 years on each of the four counts.

OPINION

We shall first address defendant's contention that the trial court's erroneous jury instructions regarding the charge of aggravated kidnaping denied him a fair trial. Defendant bases his argument on the fact that the indictment set forth the following elements of the offense: that he (1) knowingly, (2) by force or threat of imminent force while armed with a dangerous weapon, (3) carried R.K. from one place to another with intent to secretly confine R.K. against his will;

while the jury instructions stated that to sustain the charge of aggravated kidnaping, the State must prove that defendant, while armed with a dangerous weapon, secretly confined R.K. against his will. Because the indictment set forth intent to secretly confine as one of the essential elements and the instructions set forth actual secret confinement, defendant contends that the jury was not instructed on the elements of the crime charged.

■ In response, the State argues that defendant has waived review of this issue because he did not object to the jury instruction at trial and did not allege it as error in his post-trial motion. We agree and find *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248, dispositive of the issue. In *Huckstead*, at the conclusion of a murder trial, the jury received instructions regarding the State's burden of proof (Illinois Pattern Jury Instruction (IPI), Criminal, No. 2.03 (1968)) and the elements necessary to sustain a murder charge (IPI Criminal No. 7.02). However, the jury did not receive IPI Criminal No. 25.05, which provides that 'the State must also prove beyond a reasonable doubt that the degree of force used by defendant was not justified. Defendant argued that the trial court's failure to give IPI Criminal No. 25.05 constituted plain error. The *Huckstead* court held that because defendant did not object to the jury instructions at trial, did not tender IPI Criminal No. 25.05 to the court, and did not raise the issue in his post-trial motion, the asserted error was waived. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 543.) Addressing the plain error argument, the court further stated:

> "The [plain error] exception is restricted to the correction of 'grave errors' [citations] or to situations where the case is close factually and fundamental fairness requires that the jury be properly instructed. [Citations.]
> \*\*\*
> We believe in this case, the instructions, in combination with the closing arguments by counsel for both sides, apprised the jury that the State had the burden of proving that defendant was not justified in the force he used. Consequently, the failure of the trial court to give IPI Criminal No. 25.05 did not constitute 'grave error.' " 91 Ill. 2d 536, 544-45.

■ Similarly, in the present case, defendant failed to object to the jury instructions at trial, failed to tender substitute jury instructions to the court, and failed to include the jury instructions issue in his post-trial motion. Thus, we find that he has waived the issue for review. Moreover, in light of the fact that actual secret confinement of one by another who is armed with a dangerous weapon is a manifesta-

tion of the intent to secretly confine another by force or threat of force, proof of the former is necessarily conclusive of the latter. Accordingly, we conclude that the discrepancy in jury instructions did not constitute grave error such as would give rise to review of the issue under the plain error rule.

Defendant's correlative contention that defense counsel's failure to object to improper jury instructions does not constitute waiver when the instruction at issue deals with the elements of the offense is inaccurate. In *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 415 N.E.2d 1027, the supreme court held that the trial court's error in instructing the jury as to an essential element of the offense of felony theft had been waived by defense counsel's failure to object to the instructional error at trial or to raise the issue in the post-trial motion. In *Tannenbaum*, as in the present case, the court found that the evidence as to the missing element was so overwhelming and uncontradicted, that it was "inconceivable that defendants could have suffered any prejudice." 82 Ill. 2d 177, 182.

Defendant further relies on *People v. Lewis* (1969), 112 Ill. App. 2d 1, 250 N.E.2d 812, as support for his argument that the error cannot be waived because it is the trial court's duty "to ensure the jury was properly instructed on the elements of the offense." We find *Lewis* factually distinguishable from the present case and, thus, of no persuasive value. In *Lewis*, defendant, charged with the unlawful sale of narcotics, plead insanity as his defense. The appellate court held that the jury was not adequately instructed as to the elements of the crime charged because the instructions (1) omitted the element of the crime relating defendant's mental state; and (2) failed to delineate authorized statutory exceptions to the sale of narcotics. In our opinion, there is no comparison between the egregious omissions in *Lewis* and the inconsequential discrepancy in the present case which the evidence, closing arguments and instructions as a whole clearly nullify.

Finally, even if defendant's objection to the jury instructions had not been waived, defendant would not have prevailed on this issue. The offense of aggravated kidnaping is defined, in pertinent part, as follows:

> "Aggravated kidnaping. (a) A kidnaper within the definition of paragraph (a) of Section 10—1 is guilty of the offense of aggravated kidnaping when he:
>
> * * *
>
> (3) Inflicts great bodily harm or commits another felony upon his victim, or
>
> * * *

(5) Commits the offense of kidnaping while armed with a dangerous weapon, ***." (Ill. Rev. Stat. 1983, ch. 38, pars. 10—2(a)(3), (5).)

Collaterally, the offense of kidnaping is defined, in pertinent part, as:

"(a) Kidnaping occurs when a person knowingly:

(1) And secretly confines another against his will, or

(2) By force or threat of imminent force carries another from one place to another with intent secretly to confine him against his will. ***." Ill. Rev. Stat. 1983, ch. 38, pars. 10—1(a)(1), (2).

■■ As previously discussed, the indictment in the present case charged defendant with aggravated kidnaping predicated upon intent to secretly confine R.K. against his will, while the instructions focused on actual secret confinement of R.K. against his will. As the above statutory definitions clearly indicate, the discrepancy does not result in an indictment for one offense and an instruction for another offense as defendant argues. Rather, the discrepancy is merely between two subdivisions of the same offense (*People v. Turner* (1976), 35 Ill. App. 3d 550, 573, 342 N.E.2d 158), which does not serve to vitiate a conviction unless the discrepancy was of " '*** such a character as to mislead the defendant in his defense or expose him to double jeopardy.***' " (*People v. Allen* (1974), 56 Ill. 2d 536, 542, 309 N.E.2d 544.) In the present case, there is no evidence that defendant was misled in his defense, by surprise or otherwise, and there is no possibility of the existence of double jeopardy. Accordingly, we conclude that defendant was not prejudiced by the jury instructions and any error by the trial court was harmless.

We turn next to defendant's contention that pursuant to section 5—8—1(a)(4) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(4)), the trial court erred in imposing a sentence in excess of 15 years for the offense of aggravated kidnaping without a ransom which is classified as a Class 1 felony. Ill. Rev. Stat. 1983, ch. 38, par. 10—2(b)(2).

■■ The general rule regarding sentence review is that imposition of a sentence is a matter of judicial discretion and absent an abuse of discretion, the sentence of the trial court will not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) The rationale behind this rule is that because the judgment as to the proper sentence must be based on the particular factual circumstances of each case as well as on the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age, which the court is in a superior position to consider, its decisions as to sentencing are entitled to great deference and

weight. *People v. Daugherty* (1982), 104 Ill. App. 3d 89, 91-92, 432 N.E.2d 391.

■ With respect to the alleged statutory violation, we are cognizant of the fact that this issue was raised for the first time during oral argument, having been overlooked not only at the trial level, but also in the appellate briefs. Ordinarily, such an oversight would result in waiver of the issue for review. (*People v. Thomas* (1983), 116 Ill. App. 3d 216, 452 N.E.2d 77.) However, because the sentence imposed for aggravated kidnaping is patently violative of the sentencing statute, we elect to review this issue under the plain error rule. 87 Ill. 2d R. 615(a).

■ The offense of aggravated kidnaping other than for ransom is statutorily defined as a Class 1 felony (Ill. Rev. Stat. 1983, ch. 38, par. 10—2(b)(2)), punishable by a sentence not less than four years and not more than 15 years (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(4)), unless the trial court has expressly indicated that the particular circumstances warrant an extended term sentence (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2). Because the record in the present case is void of any evidence that the trial court intended to impose an extended-term sentence, we conclude that the trial court abused its discretion and erroneously imposed a 25-year sentence for the offense of aggravated kidnaping without a ransom. Accordingly, pursuant to Supreme Court Rule 615(b)(4) (87 Ill. 2d R. 615(b)(4)), which grants reviewing courts the power to reduce sentences imposed by the trial court, we reduce the aggravated kidnaping sentence to 15 years.

With respect to the sentences imposed for the remaining convictions, we shall address defendant's contentions that the trial court erroneously considered his refusal to acknowledge guilt and did not give proper consideration to his excellent prior record. We disagree.

At the sentencing hearing, following arguments in aggravation and mitigation, which included mitigating testimony by several of defendant's family members and a former employer, the trial court stated:

> "Mr. Singleton, you stand convicted of two counts of armed robbery and one count of aggravated kidnapping and one count of deviate sexual assault. A jury heard the evidence in the case and found you guilty of those four charges.
>
> I would say the State's case was a very, very strong case, a very strong case. I think you have received a fair trial, and I think you received effective and vigorous representation.
>
> I take note of the fact that you have some people in your family, someone you worked for [for] a couple of years, who

love you very much and care a great deal about you. I wish you had been thinking about them on the night that you got into all this trouble. I believe very strongly that you did it.

I had the opportunity to observe your testimony during the course of the trial, and I must say that I couldn't believe the preposterous story you told any more than the way you told it. Your own effect on the witness stand lacked any credibility as far as I'm concerned.

Under the law I could sentence you to consecutive sentences amounting to 120 years. When I think about your family, they all seem to be very nice people, but I'm also thinking about the people who you hurt, people you might have hurt much worse if that squad car hadn't been where it was on Harlem Avenue on the night in question.

I note your total lack of contrition, a total sense of disregard for the conventions that you must have been taught as a young child at home or at church, and you have rejected all that. I saw you sitting up on that witness stand perjuring yourself so you rejected it just as you rejected it on that night. I don't think you are entitled to any leniency in sentencing.

However, I take note of the fact that you are 25 years old, and that you do have a family that cares about you and that may work with you over the years to come and perhaps bring you around to believe that what you were taught in church was right."

■■ ■ As a general rule, a sentencing judge has the legal authority to evaluate a defendant's testimony on the stand, to determine whether that testimony contained wilful and material falsehoods and to balance that determination against his prospects for rehabilitation and restoration to a productive position in society. (*People v. Galati* (1979), 75 Ill. App. 3d 860, 865, 393 N.E.2d 744.) Moreover, a sentencing judge may properly consider what he believed to have been perjury committed by defendant during the trial. *United States v. Grayson* (1978), 438 U.S. 41, 55, 57 L. Ed. 2d 582, 592, 98 S. Ct. 2610, 2618.

■■ In the present case, the trial court commented on the State's strong case, defense counsel's vigorous representation, defendant's rehabilitative potential as demonstrated by a caring family, defendant's lack of credibility on the stand, his absence of any sense of contrition, and the court's belief that defendant had perjured himself on the stand. In our opinion, none of these comments demonstrates an abuse of discretion by the trial court. Moreover, we do not interpret the

court's comment regarding defendant's lack of contrition as an improper comment on his refusal to admit guilt. Instead, we construe it as a comment on defendant's demeanor, a factor well within the trial court's purview. Thus, in light of the circumstances and factors considered by the trial court in rendering its sentence determination, we conclude that the imposition of concurrent terms of 25 years for the remaining convictions was not an abuse of discretion.

■■■ Finally, we find that defendant's reliance on *People v. Williams* (1978), 62 Ill. App. 3d 966, 379 N.E.2d 1268, *People v. Hastings* (1979), 72 Ill. App. 3d 816, 390 N.E.2d 1273, and *People v. Nelson* (1982), 106 Ill. App. 3d 838, 436 N.E.2d 655, as support for his argument that his clean record, youthful age and rehabilitative potential mandate reduction of his sentences is misplaced. In *Williams*, defendant, age 21, was sentenced to a term of 40 to 140 years' imprisonment for convictions of armed robbery, aggravated battery and attempted murder. On appeal, the reviewing court reduced defendant's sentence to 15 to 45 years, noting defendant's young age, the absence of previous convictions, his unstable home life, and the fact that he had a young child. In reaching its decision, the court stated, "[W]e have an obligation to uphold the constitutional objective of restoring this youthful offender to resourceful citizenship." (*People v. Williams* (1978), 62 Ill. App. 3d 966, 976.) The pivotal distinction between *Williams* and the present case is the length of the original sentence imposed in *Williams* which the court found impeded rehabilitation. To the contrary, we do not find that the 25-year concurrent sentences imposed in the present case impinge on the goal of restoring defendant to "resourceful citizenship."

In *Hastings*, the appellate court focused on defendant's rehabilitative potential and reduced his sentence of 20 to 60 years for deviate sexual assault to nine to 27 years. In making its determination, the *Hastings* court considered defendant's youth, his record of only one misdemeanor conviction and his successful completion of trade school. Admittedly, in the present case, defendant is also young and has no prior convictions. However, the similarities terminate there. Defendant is a high school drop-out, and has held eight different jobs within a period of seven years, the longest one for a year. Further, although he is enlisted in the Marine Reserves, the record reveals that defendant's monthly reserve pay has been terminated for nonattendance at weekend reserve meetings. More importantly, in *Hastings*, defendant was convicted solely of deviate sexual assault, while, in the present case, defendant was armed with a .37 magnum, robbed both D.H. and R.K., forced R.K. into an automobile trunk at gunpoint, threatened

R.K.'s life, and performed cunnilingus on D.H.

Finally, in *Nelson,* defendants' sentences for armed robbery were reduced from 20 years to 10 years in light of their ages, prior scholastic records, work histories, and criminal records. Again, we acknowledge the similarity between the two cases as far as age and absence of a prior criminal record. However, we also acknowledge the dissimilarities, *i.e.,* scholastic records, work histories, and the expressed desire to receive job counseling and training, and therefore find *Nelson* unpersuasive.

In summary, we find that the trial court properly considered the evidence in mitigation and did not abuse its discretion in imposing 25-year concurrent sentences for deviate sexual assault and two counts of armed robbery. We further find that the trial court's error regarding the sentence imposed for aggravated kidnaping does not necessitate a remand for resentencing on all counts. See *People v. Nelson* (1982), 106 Ill. App. 3d 838, 436 N.E.2d 655.

Accordingly, we affirm the convictions, affirm the 25-year sentences for deviate sexual assault and the two counts of armed robbery, and reduce the aggravated kidnaping sentence to 15 years, all to be served concurrently.

Affirmed as modified.

MEJDA, P.J., and O'CONNOR, J., concur.