2025 IL App (1st) 221918

No. 1-22-1918

Opinion filed June 13, 2025

FIFTH DIVISION

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 03911 |
| | ) | |
| LUIS CASTEJON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MITCHELL delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment and
opinion.

**OPINION**

¶ 1    Defendant Luis Castejon appeals his convictions for first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)), attempted first degree murder (720 ILCS 5/8-4(a) (West 2018), *id.* § 9-1(a)(1)), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)), and his aggregate 40-year sentence. At trial, defendant testified that he acted in self-defense, a defense the jury rejected.

¶ 2    On appeal, defendant contends that (1) his first degree murder conviction should be reduced to second degree because, in viewing the trial evidence in the light most favorable to the prosecution, no rational trier of fact could have found that mitigating factors were not present. In

addition, defendant argues that (2) the State failed to prove that he acted with a specific intent to kill without lawful justification; (3) the circuit court abused its discretion by allowing a 911 call into evidence and committed plain error on other evidentiary rulings; (4) he was denied effective assistance of counsel due to his trial counsel's supposed conflict of interest; and (5) the circuit court abused its discretion in sentencing defendant to an aggregate term of 40 years. For the following reasons, we reject defendant's contentions and affirm his convictions and sentence in all respects.

¶ 3                                    I. BACKGROUND

¶ 4     On February 19, 2019, defendant Luis Castejon fired his gun six times at a car in rush hour traffic at the intersection of Milwaukee Avenue and Addison Street in Chicago, killing 17-year-old Emmanuel Gallegos, a passenger in the car. This fact is uncontroverted. The defense theory at trial was that defendant acted in self-defense, because he "thought he was going to be the victim of a drive-by shooting."

¶ 5     At trial, the State presented testimony from Jonathan Seiba, another passenger, and Steve Jaimes, the driver of the car, who established the occurrence facts. Jaimes testified that he and Gallegos were friends and students at North Side College Prep. On the day of the shooting, Jaimes stopped to pick up Seiba, his cousin, at Carl Schurz High School. Gallegos rode in the front passenger seat of Seiba's 2004 Acura, and Seiba got into the back seat.

¶ 6     Rush hour traffic was heavy. Jaimes turned onto Milwaukee from Addison. As Jaimes was driving, Seiba recounted how he had just been "checked" by "some random dudes." Jaimes explained "checked" to mean Seiba was asked if "he gang bangs." Jaimes, Seiba, and Gallegos were not in a gang. As they drove, Seiba then pointed out the group of guys who "checked" him

walking westbound on Addison. Jaimes made a U-turn to confront the group so he could "defend his little cousin."

¶ 7    As Jaimes approached, he saw "all the guys throwing up gang signs." He saw defendant "smirk[ ] confidently," pull up his black hoodie, and reach for his waistband. Defendant started shooting. Jaimes testified that prior to the shooting, no one in the car said anything, made any gestures, or tried to exit.

¶ 8    Jaimes sped off and then called 911. When he pulled over to help Gallegos, he saw that Gallegos had been shot in the neck and was bleeding from the right side of his waist. A surveillance video introduced into evidence showed Jaimes trying to aid his friend and then flagging down a police officer for help.

¶ 9    Betsaid Isidro was with defendant at the time of the shooting. He testified about a Snapchat video that he and defendant had made earlier on the day of the shooting. In the video, defendant pointed a Glock at the camera and made gang signs while a rap song played in the background. Isidro went on to corroborate Seiba's account and said that his group checked Seiba twice before the shooting. He also corroborated Jaimes's testimony that the victims had not said anything or displayed weapons before defendant started shooting at their vehicle.

¶ 10    Jocelyn Garcia was also with defendant at the time of the shooting. Garcia also corroborated Seiba's and Jaimes's account. On the evening after the shooting, on Facebook Messenger, defendant apologized to Garcia for leaving her after the shooting, told her he would stop gang banging, and asked her to "say nun."

¶ 11    The defense offered the testimony of defendant. He testified that in the week prior to the shooting, he had been jumped by members of a rival gang. The rival gang filmed themselves

chasing defendant down in a vehicle and then initiating a fight with him. Although the initial confrontation was in the video, the ensuing fight defendant described was not, and there was no other corroborating evidence for a fight that defendant said left him unconscious in an alley. Defendant asserted this incident was the motivation for him to get a gun for self-defense. He testified he received the gun from another member of his gang. He explained that the Snapchat video from earlier in the day was for online "clout."

¶ 12    Defendant testified that he was scared when the victims' car slowed down behind them on the street because he had been victimized in a drive-by shooting before. He said he believed the people in the car were from the same gang that had attacked him the previous week, despite it not being the same car. In contrast to the other witnesses, he testified that he saw the people inside the car display gang signs out of the window. Defendant admitted to shooting at the car but denied he was trying to kill anyone. He noted that in the Facebook messages to Garcia, he expressed his fear and that at the time he was "focus[ed] on the opps," meaning opposition, and "w[h]at if they up banger on us?" He testified he returned the gun to the gang before turning himself in.

¶ 13    The jury found defendant guilty of first degree murder with respect to Gallegos, attempted first degree murder of Seiba, and aggravated discharge of a firearm, but the jury acquitted defendant of attempted first degree murder of Jaimes. After denying defendant's posttrial motion, the circuit court sentenced defendant to consecutive terms of 34 years for first degree murder and 6 years for attempted first degree murder with a concurrent 4 years in prison for aggravated discharge of a firearm. This timely appeal followed. Ill. S. Ct. R. 606 (eff. Mar. 12, 2021).

¶ 14                                   II. ANALYSIS

¶ 15                        A. Reduction to Second Degree Murder

¶ 16     Defendant contends that the trial evidence *only* supports second degree murder for the death of the Gallegos, because he presented evidence supporting his subjective belief in the need for self-defense. In Illinois, second degree murder is a lesser mitigated offense of first degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995). Second degree murder requires two steps of analysis. First, the State must prove beyond a reasonable doubt that a defendant committed first degree murder. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 3. Then, a defendant must prove by a preponderance of the evidence that one of the mitigating factors for second degree murder was present: either a serious provocation or an unreasonable belief in the need for self-defense. 720 ILCS 5/9-2(a)(1)-(2), (c) (West 2018). Defendant argues that he proved, by a preponderance of the evidence, that "at the time of the killing he *** believe[d] the circumstances to be such that, if they existed, would justify or exonerate the killing ***." *Id*. § 9-2(a)(2).

¶ 17     This is an atypical challenge to the sufficiency of the evidence. In the typical case, a defendant challenges the sufficiency of the *State's* evidence, and the familiar *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), standard controls: "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Id.* Here, in contrast, defendant contends that *the defense* presented sufficient evidence to prove one of the mitigating factors. "In this context, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were *not* present." (Emphasis added.) *People v. Blackwell*, 171 Ill. 2d 338, 357-58 (1996).

¶ 18    Again, the presence of a mitigating factor is a question of fact, and our task on review is not to reweigh the evidence and substitute our judgment for that of the jury. *People v. Hardman*, 2017 IL 121453, ¶ 37. Further, a jury is not required to find the defendant credible. *People v. Rutigliano*, 2020 IL App (1st) 171729, ¶ 82. The jury may "accept or reject all or part of a witness' testimony." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 62. As a consequence, the scope of our review is strictly limited to assuring that the jury operated within its defined parameters: in evaluating the trial record as a whole, in the light most favorable to the prosecution, there must be some evidence from which a reasonable juror could find the way the jury found. *Jackson*, 443 U.S. at 318-19.

¶ 19    Based on the totality of the trial record here, there is an abundance of evidence to justify a rational juror rejecting defendant's claimed belief in the need for self-defense. That is, the evidence supporting the claimed mitigating factor was conflicting such that the jury could freely reject it. For example, although defendant testified that he saw the car's occupants making gang signs, his claim was contradicted by other witnesses, including those with defendant. Similarly, defendant claimed he was afraid the people in the car were those who had attacked him previously. But the car was different, and defendant did not recognize the people inside. And while defendant claims he was beaten unconscious in the previous attack, he made no police report, he did not seek medical attention, and he was not visibly injured in a way consistent with his reported injuries. This squarely presents a question of defendant's credibility, and a jury is *not* required to accept his account. *People v. Bush*, 2023 IL 128747, ¶ 36.

¶ 20    Further, defendant's actions after the shooting also cast doubt on his claim he was subjectively afraid for his life. Defendant fled the scene and disposed of his weapon after the

shooting. Such actions are "competent circumstantial evidence that refutes the theory that [a] defendant acted in self-defense" even under an unreasonable belief theory. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59. Defendant's request that Garcia "say nun" also discredits a claim of self-defense. *People v. Wilburn*, 263 Ill. App. 3d 170, 179 (1994) (considering defendant's instruction to a witness not to say anything in finding she did not act reasonably in self-defense).

¶ 21    None of this is to say there was *no* evidence that defendant might have subjectively been afraid for his life, but it is the jury's job to weigh that evidence and make credibility findings. Based on the totality of this trial record, a rational finder of fact could have found that defendant failed to meet his burden to prove mitigating factors for second degree murder.

¶ 22              B. Sufficiency of the Evidence for Attempted First Degree Murder

¶ 23    Defendant claims that the State's evidence was insufficient to prove that he had the required mental state for attempted first degree murder. Defendant argues the evidence of his subjective state of mind showing he unreasonably believed in the need for self-defense meant he did not have the mental state needed for attempted first degree murder. The State contends there is sufficient circumstantial evidence showing his state of mind to uphold the conviction.

¶ 24    Due process requires that the State prove each element that constitutes the crime charged beyond a reasonable doubt. *People v. Murray*, 2019 IL 123289, ¶ 28. First degree murder requires proving an intent to kill without lawful justification. 720 ILCS 5/9-1(a). Attempt offenses, in contrast, require the accused to have the intent to commit the specific offense and to commit an act that constitutes a substantial step toward the commission of that offense. *Id*. § 8-4(a). This is separate from the intent required to commit the predicate offense. *People v. Lopez*, 166 Ill. 2d 441,

449 (1995). For this reason, Illinois does not have attempted second degree murder, as you cannot intend to both unlawfully kill while also intending to justifiably use deadly force. *Id*. at 448-49.

¶ 25    Recently, in a case decided after this appeal was briefed, the Illinois Supreme Court held that the mental state required for attempted first degree murder is "intent to kill without lawful justification." *People v. Guy*, 2025 IL 129967, ¶ 53. In *Guy*, the court held that the jury's verdict of second degree murder was incompatible with a conviction for attempted first degree murder. *Id*. ¶ 77. The court held it was inconsistent to convict the defendant of second degree murder of one victim in a shooting and attempted first degree murder of another victim in the same shooting, as the two offenses required different mental states. See *id*.

¶ 26    Here, defendant asserts that because he had an unreasonable belief in his justification for the use of force, he cannot have had the mental state required for attempted first degree murder. However, in this case the jury *rejected* defendant's claim of self-defense for the murder and found defendant guilty of first degree murder and attempted first degree murder. There is no inconsistency in those verdicts.

¶ 27    At bottom, defendant is raising another sufficiency challenge. Again, when reviewing for sufficiency of evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Aljohani*, 2022 IL 127037, ¶ 66. Here, there was evidence that defendant fired a handgun at a vehicle he knew was occupied, which could allow a rational finder of fact to conclude he had intent to kill. See *People v. Garcia*, 407 Ill. App. 3d 195, 201 (2011) (firing a gun into an occupied vehicle was sufficient for the finder of fact to infer an intent to kill). Defendant also testified he knew guns could cause death or great bodily harm. Since

a rational trier of fact could have found that defendant both had the intent to commit first degree murder and took a substantial step towards the commission of that act by shooting into the car, the evidence was sufficient to sustain defendant's conviction for attempted first degree murder.

¶ 28                                C. Evidentiary and Closing Argument Issues

¶ 29    Defendant contends the circuit court abused its discretion in several evidentiary rulings and also complains about the State's closing argument. Specifically, defendant takes issue with the following: (1) the admission of 911 call audio, (2) the admission of a portion of Garcia's grand jury testimony that was used to impeach her, (3) the prosecution's presentation of admitted exhibits during rebuttal of defense's closing argument, and (4) the prosecutor's statement in closing argument claiming defendant said he was going to "take care of" his gang opponents.

¶ 30    To preserve a purported error for appellate review, a defendant must (1) raise it in either a motion *in limine* or a contemporaneous trial objection and (2) include it in a posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 11. "Failure to preserve an error results in forfeiture." *People v. Schoonover*, 2021 IL 124832, ¶ 22. Of the four errors claimed, only the admission of the 911 call into evidence was properly preserved. Although defendant's objection to the prosecution's presentation of exhibits during rebuttal involved the disputed 911 audio, how it was used is a distinct issue from its admission into evidence, representing a separate objection which was not properly preserved. See *People v. Jackson*, 293 Ill. App. 3d 1009, 1015-16 (1997) (analyzing separately a challenge to the admission of a 911 tape and a challenge to the use of the tape in rebuttal).

¶ 31    The circuit court admitted the 911 call under the excited utterance exception to the hearsay rule. Ill. R. Evid. 803(2) (eff. Mar. 24, 2022) ("A statement relating to a startling event or condition

made while the declarant was under the stress of excitement caused by the event or condition."). The requirements for admissibility under this exception are: "(1) the occurrence of an event *** sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) a statement relating to the circumstances of the occurrence." *People v. Lerma*, 2016 IL 118496, ¶ 5 n.1. The 911 call here certainly qualifies: the call occurred moments after the shooting, and in the call, a startled Jaimes describes the occurrence in a spontaneous manner, free from any hint of fabrication. 4 Jones on Evidence § 28:16 (7th ed.) ("A phone call to 911 just after declarant has been victimized by, escaped from, witnessed or discovered a crime, arises frequently in the case law, and such calls often qualify as excited utterances.").

¶ 32 Defendant argues that the circuit court nonetheless abused its discretion because the 911 call was unfairly prejudicial and should have been excluded under Rule 403:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

A trial judge has discretion in deciding whether to exclude otherwise relevant evidence under Rule 403. *People v. Hanson*, 238 Ill. 2d 74, 102-03 (2010); *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 461 (1992) ("Absent a clear showing that the trial court has abused its discretion in admitting certain evidence, its determination will remain undisturbed.").

¶ 33 Defendant complains that the 911 call was "extremely inflammatory," because jurors heard Jaimes recounting, "[m]y friend just got shot," Gallegos "looks cold," and "oh no, I see blood behind his neck." But this was a murder prosecution, after all. Only *unfairly* prejudicial evidence may be excluded, and that is evidence that invites the fact finder to decide the case on a basis other than the merits. *People v. Parker*, 335 Ill. App. 3d 474, 487-88 (2002) (citing *Old Chief v. U.S.*,

519 U.S. 172, 180 (1997)). Even evidence that is gruesome or inflammatory may be admitted if it has sufficient probative value. See, *e.g.*, *People v. Degorski*, 2013 IL App (1st) 100580, ¶¶ 100-02 (holding that the prejudicial effect of a video of bodies being removed from a freezer did not outweigh its probative value). The circuit court may only exclude evidence under Rule 403 if the probative value of the evidence is *substantially outweighed* by the danger of unfair prejudice.

¶ 34 Here, the 911 call plainly had probative value. Defendant's claim of self-defense turned on his perception of Jaimes's and Seiba's conduct. There is nothing in Jaimes's description and immediate reaction to the shooting (including his description of the shooter) that suggests that Jaimes was the first aggressor or possible gang opponent of defendant. Rather, Jaimes's reaction was, as the circuit court found, the "spontaneous declarations of somebody that just went through a trauma" who was "the victim of an aggravated discharge and attempted murder." "He is telling the police to come immediately, he is telling them why and that is the beginning of the police investigation." Indeed, 911 calls may be admitted into evidence if they help "the jury understand why the police acted the way they did." *People v. Hudson*, 2023 IL App (1st) 192519, ¶ 78.

¶ 35 Unlike the case cited by defendant, the call was not all that inflammatory. In *People v. Smith*, 2017 IL App (1st) 143728, the 911 call contained mostly panicked screams telling the operator that someone had been stabbed. *Id*. ¶ 65. The call did not contribute to the State's case as it "provided no insight into the actual stabbings, what precipitated them, or defendant's sanity." *Id*. ¶ 68. The call's only purpose was "to give the jury a real-time look at the moments immediately after the stabbings and the resulting emotions of horror and shock experienced by the people at the scene." *Id*. Here, in contrast, the 911 call sheds light both on the material facts of the shooting itself and on the victims' state of mind which is directly relevant to defendant's claim of self-defense.

¶ 36    Defendant also complains that the 911 call was cumulative of Jaimes's in-court testimony, but exclusion of cumulative testimony is rarely required. *Lee*, 152 Ill. 2d at 464 (concluding that although cumulative, having the head of safety for the Chicago Transit Authority confirm a list of accidents was not unfairly prejudicial). Evidence is only cumulative if it "adds nothing." *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). Recorded evidence *often* overlaps with in-court testimony and is nonetheless properly admitted. See, *e.g.*, *People v. Jurczak*, 147 Ill. App. 3d 206, 213 (1986). Evidence that is "merely repetitious or time-consuming may be excluded, but only if time considerations substantially outweigh the incremental probative value of the proffered evidence." Michael H. Graham, Graham's Handbook of Illinois Evidence § 403.1 at 206 (10th ed. 2010). Given the probative value of the 911 call and its very short duration (3 minutes and 27 seconds), the record simply does not support defendant's contention that the evidence was impermissibly cumulative. Against this backdrop, the circuit court's decision to admit the 911 call was not arbitrary, fanciful or unreasonable and was therefore not an abuse of discretion. *Hanson*, 238 Ill. 2d at 101.

_____

¶ 37    Defendant argues that the remaining forfeited claims should be reviewed under the plain error doctrine or, alternatively, that his counsel was ineffective for failing to preserve them. The Illinois Supreme Court has found that "[b]efore plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed." (Internal quotation marks omitted.) *People v. Keene*, 169 Ill. 2d 1, 18 (1995) (quoting *People v. Precup*, 73 Ill. 2d 7, 17 (1978)). The first step in plain

error analysis is to determine whether an error occurred. *People v. Logan*, 2024 IL 129054, ¶ 53. Before advancing to the later steps of plain error analysis, the issues will be examined for error.

¶ 38                    1. *Prosecutor's Use of Exhibits During Closing Rebuttal*

¶ 39    Defendant challenges the State's use of admitted exhibits in its rebuttal argument and argues that it constituted an improper effort to inflame the emotions of the jury. At the end of its rebuttal, the State presented a "memorial" to the victim by way of a multimedia presentation, which involved playing the 911 call over surveillance video of the shooting and closing out with life and death photos of Gallegos. The actual multimedia presentation is not included in the record on appeal, but the constituent pieces are in the record. Because the presentation can be reasonably reconstructed from the record, we will consider the issue, but "[a]ny doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Again, the multimedia presentation played without objection.

¶ 40    Prosecutors have wide latitude in closing arguments, *People v. Jackson*, 2020 IL 124112, ¶ 82, but they may not make arguments simply to inflame the jury. *People v. Blue*, 189 Ill. 2d 99, 128 (2000). "Closing argument must serve a purpose beyond inflaming the emotions of the jury," and inflammatory arguments are improper when they do not "[throw] any light upon the issues." (Internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 128-29 (2007) (quoting *People v. Halteman*, 10 Ill. 2d 74, 84 (1956)).

¶ 41    Courts may allow the State to use admitted recordings in closing arguments. *People v. Forcum*, 344 Ill. App. 3d 427, 446 (2003) ("A trial court's decision to allow counsel to read from the record during closing arguments will not be disturbed absent an abuse of discretion."). "[I]t is not error for the State to rely on properly admitted evidence" during closing arguments. *People v.*

*Herring*, 2018 IL App (1st) 152067, ¶ 83. There are cases where courts have found error in allowing the State to play extended recordings during closing arguments. See *People v. Gross*, 265 Ill. App. 3d 74, 77 (1994) (prosecution was only allowed to play eight smaller excerpts of a 45-minute tape); *People v. Ammons*, 251 Ill. App. 3d 345, 347 (1993) (playing 18 minutes of a recording was prejudicial). Courts have allowed shorter recordings admitted into evidence to be played. See *People v. Graves*, 2012 IL App (4th) 110536, ¶ 41 (prosecution was allowed to replay portions of admitted videotape during closing arguments); *Forcum*, 344 Ill. App 3d at 446 (court allowed an answering machine message to be played that "constituted only a small portion of the State's closing argument").

¶ 42   In challenging the presentation as a whole, defendant reiterates his position that the 911 call should not have been admitted into evidence at all, and that its use in rebuttal was similarly prejudicial with even less probative value. Defendant also contends that it was improper to show the presentation because it rebutted nothing in the defense's closing argument.

¶ 43   Here, the defense's closing argument questioned the credibility of Jaimes and Seiba and sought to undermine their version of the shooting and its immediate aftermath. The 911 call and the surveillance video in the multimedia presentation rebutted this defense argument. *People v. Hudson*, 157 Ill. 2d 401, 445 (1993) ("This court has held that when defense counsel provokes a response, the defendant cannot complain that the prosecutor's reply denied him a fair trial."). This rebuttal makes defendant's reliance on *Smith*, 2017 IL App (1st) 143728, ¶¶ 64-72, inapposite. *Id*. (holding that 911 call was inadmissible where it "provided no insight" into the offense). Prosecutors are free to comment on the evidence and argue inferences, *People v. Adams*, 2012 IL 111168, ¶ 18, but in this instance, there was *no* commentary or argument: the State merely replayed

for a few minutes pieces of evidence properly admitted on their own and already published to the jury. There is nothing inherently improper about this.

¶ 44                                    2. *Garcia's Grand Jury Testimony*

¶ 45    Defendant argues that the State's impeachment of Garcia with her grand jury testimony, describing what happened when defendant and his friends gang-checked Seiba, was improper. Defendant contends that this prior statement was inadmissible hearsay. A prior inconsistent statement is admissible if "the statement is inconsistent with [the witness's] testimony at the hearing or trial, *** the witness is subject to cross-examination concerning the statement, and *** the statement was made under oath at a trial, hearing, or other proceeding." 725 ILCS 5/115-10.1 (a)-(c)(1) (West 2018). Grand jury testimony qualifies as a statement made under oath at another proceeding. *People v. Harvey*, 366 Ill. App. 3d 910, 921 (2006). Section 115-10.1 includes "evasive answers, silence, or changes in position" as well as direct contradictions. *People v. Martinez*, 348 Ill. App. 3d 521, 532 (2004). In this case, Garcia's in-court testimony that she "could not remember" what Seiba had said contradicted her grand jury testimony that Seiba said nothing and that he seemed "confused" by defendant's conduct.

¶ 46    Defendant does not object to this portion of the inconsistent testimony but to later grand jury statements where Garcia said, "I thought at first in my head I hope they don't jump this boy" and "I'm like [defendant] keep walking." These portions of her grand jury testimony were not themselves inconsistent with her failures to recall, but they were part of a larger statement which had inconsistencies. However, the Illinois Supreme Court has previously held there is no "quantitative or mathematical analysis" of whether enough inconsistencies appear in part of a

statement to justify admitting the whole statement under section 115-10.1. *People v. Salazar*, 126 Ill. 2d 424, 456-58 (1998).

¶ 47　Defendant also complains that the statements were speculative. Under Rule 701, a witness may offer testimony "in the form of opinions or inferences" that are "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Ill. R. Evid. 701 (eff. Jan. 1, 2011). Defendant rightfully notes that this is not an unlimited license for witnesses to speculate. *People v. Ward*, 2021 IL App (2d) 190243, ¶ 72 (witness could not describe how complainant felt when pushed), *vacated on other grounds*, 210 N.E. 3d 769 (Ill. 2023); *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 124 (holding that generalized fears about possible future crimes amounted to an opinion on the defendant's character). However, a witness may offer opinion testimony rationally based on the witness's perception and understanding, rather than speculation about the defendant's understanding. *People v. McLaurin*, 2015 IL App (1st) 131362, ¶ 45.

¶ 48　Here, Garcia was testifying to an event that she personally witnessed from just a few feet away. The event involved defendant gang-checking Seiba. Defendant notes elsewhere in his brief that "gang confrontation's logical consequence is gang violence." This situation is thus easily distinguishable from *Zimmerman*. There, the excluded statements focused on a possible crime at some point in the future based only on generalized fears. *Zimmerman*, 2018 IL App (4th) 170695, ¶ 124. Here, in contrast, Garcia was expressing her specific fear that defendant would escalate an ongoing gang confrontation and "jump" Seiba.

¶ 49          3. *Prosecutor's Statement During Closing Arguments*

¶ 50    Defendant argues that the prosecutor made a misleading argument during rebuttal when she argued that the jury "saw and heard about the messages with [Garcia], going to take care of the op[p]s." Defendant claims that this is a misstatement of a text exchange where defendant wrote, "No that was so wrong for me I forgot all about th[a]t yo[u] was next to me [and] I was focused on the opps w[h]at if they up banger on us?" Defendant claims this misstatement turned his statement expressing fear about past events into one which implied an intent to kill in the future.

¶ 51    Again, a prosecutor is free to comment on the evidence and argue reasonable inferences, even if another, innocent inference is also possible. *People v. Salas*, 2011 IL App (1st) 091880, ¶¶ 104-06 (prosecutor's statement that defendant threw up a gang sign in an arrest photo was not a reversible error despite defendant's alternative explanation that he was showing his finger tattoos as requested by the police). Context matters. In this case, the prosecutor was not purporting to quote defendant verbatim but rather made an argument playing on defendant's words:

> "[D]efendant wasn't afraid of anything. He had [the gun] on that day. He was with [Garcia]. He was going to show everybody don't mess with me, man. You saw and heard about the messages with [Garcia], going to take care of the op[p]s. That's the defendant's world."

¶ 52    Lawyers are allowed to argue, and the jury here was repeatedly instructed that what a lawyer argues is *not* evidence. *Jackson*, 2020 IL 124112, ¶ 87 (whether the jury was instructed to disregard statements made in closing arguments not based on evidence was an "appropriate factor" to consider in reviewing a challenged remark's prejudicial impact). The prosecutor was challenging defendant's claim that he believed he was in danger and acted in self-defense. That is fair game.

¶ 53    Defendant argues that based on *People v. Thompkins*, 121 Ill. 2d 401, 422 (1988), a prosecution reference to "take care of that" meant "kill." The reliance on *Thompkins* is particularly curious because the Illinois Supreme Court ultimately concluded that the unobjected comment in the opening statement was a reasonable inference to be argued from the evidence—consistent with our conclusion in this case. *Id*. While defendant stated in his text that he was "focus[ed] on the opps," not that he would "take care of" the "opps," no prejudice resulted. It was a single comment in almost fifteen pages of closing arguments. See *Jackson*, 2020 IL 124112, ¶ 87 (holding that length of closing arguments may be considered when assessing a comment's prejudicial effect). The text messages were themselves an exhibit in evidence published to the jury. Additionally, the circuit court instructed the jury to disregard statements made in closing arguments not based on the evidence, which is curative. *Id*.

¶ 54              4. *Cumulative Error and Ineffective Assistance of Counsel*

¶ 55    Defendant's claims of cumulative error and ineffective assistance of counsel are without merit. Suffice it to say, in the absence of an error, there can be no cumulative error. *People v. Caffey*, 205 Ill. 2d 52, 118 (2001) (when no error occurs or rises to the level of plain error, "defendant is not entitled to a new trial on the basis of cumulative error"). Similarly, counsel cannot be ineffective for failing to make futile objections. *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 50 ("An objection would have failed, so defense counsel cannot be faulted for not making one.").

¶ 56              D. Trial Counsel's Alleged Conflict and Ineffective Assistance

¶ 57    Defendant claims that his trial counsel had a conflict of interest when he "implicitly admitted" his own ineffectiveness by raising a supposed jury instruction error for the first time in a posttrial motion. In that motion, counsel argued that the instruction on reasonable belief should

have been modified to include language urging the jury to consider defendant's youth in determining what is reasonable. Trial counsel asked the circuit court to set aside any forfeiture given the significance of the issue. We review whether an attorney had a conflict of interest *de novo*. *People v. Garcia*, 2018 IL App (5th) 150363, ¶ 26.

¶ 58 Illinois Supreme Court Rule 451(c) provides that "substantial defects" in jury instructions "are not waived by failure to make timely objections thereto," Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013), and while trial counsel did not reference Rule 451, he did invoke plain error, which is coextensive with Rule 451(c). *People v. Sullivan*, 2014 IL App (3d) 120312, ¶ 47. Indeed, the circuit court entertained the instructional issue on the merits, and it did not invoke waiver or forfeiture. In substance, there was and is *no* legal support for the requested modification, and defendant even now cites none. Further, the circuit court expressly stated that it would have rejected the proposed modification to the Illinois Pattern Jury Instructions, so the failure to request the modified instruction sooner in no way prejudiced defendant. The factual predicate for defendant's claim of conflict and ineffectiveness simply does not exist.

¶ 59 While an attorney cannot be expected to argue his own ineffectiveness when it would create a conflict, *People v. Lawton*, 212 Ill. 2d 285, 296 (2004), trial counsel never claimed to be ineffective. So this case is clearly distinguishable from *People v. Brown*, 2017 IL App (3d) 140921, and others, where counsel alleged their own ineffectiveness. Rather, trial counsel here belatedly raised an instructional issue, which the Illinois Supreme Court Rules expressly allow him to do. An instructional error raised for the first time in a posttrial motion does *not* constitute an allegation of ineffective assistance of counsel. *Sullivan*, 2014 IL App (3d) 120312, ¶ 47. And with good reason. As the *Sullivan* court explained, the practical consequences of adopting defendant's

position would be that "a new defense attorney would have to be appointed to raise potentially forfeited errors in posttrial motions." *Id.* ¶ 48. Not only would this needlessly strain resources, it would also have the unintended consequence of denying a defendant the posttrial assistance of his trial counsel—the attorney most familiar with his case. *Id.*

¶ 60                                    E. Sentencing

¶ 61     Defendant argues that the circuit court abused its discretion in imposing a 40-year aggregate sentence and failed to accord appropriate weight to mitigating factors. Trial courts are afforded great deference in sentencing, *People v. Alexander*, 239 Ill. 2d 205, 212 (2010), and we review sentencing determinations for an abuse of discretion. *People v. O'Neal*, 125 Ill. 2d 291, 297-98 (1988). An abuse of discretion occurs when "the sentence is greatly at variance with the spirit and purpose of the law [ ] or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Snyder*, 2011 IL 111382, ¶ 36 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). "The reviewing court should not substitute its judgment for that of the trial court simply because it would have balanced the appropriate sentencing factors differently." *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 62     Here, defendant's sentence falls within the statutory range of 20 to 60 years' imprisonment for first degree murder. 730 ILCS 5/5-4.5-20(a) (West 2018); *cf. People v. Buffer*, 2019 IL 122327, ¶ 39 (upholding 40-year sentences for juvenile offenders who commit first degree murder). Significantly, the circuit court did not impose the discretionary firearm enhancement. 730 ILCS 5/5-4.5-105(b) (West 2018). Contrary to defendant's assertions, the circuit court expressly considered defendant's youth and rehabilitative potential. We set out the circuit court's reasoning

at length not just because it expressly defeats defendant's assertions, but also because the ruling is

a model of a balanced approach to criminal sentencing:

> "I have a 17-year-old boy who grew up, as has been indicated, under difficult family circumstances. A dad had abandoned him. May have been some things going on, prenatal issues. I don't know about all of that. But what I do know is that he managed to find himself in a gang life, and that is something he did voluntarily.
>
> Let me explain, my role here is not just to render fairness to Mr. Castejon and to look at all the mitigating things about him, but I have an obligation to the public as well, to protect the public from people that I believe are predators and people that are dangerous, and I believe that what happened in this case indicates to me that Mr. Castejon does represent a definite, clear danger to the community as well.
>
> So he's in a gang. And as gang bangers do with each other, as we hear about all too often here, they are beating each other up and he gets attacked. The people are attacking him and live streaming this on YouTube. It's a gang offense. They are hitting him with fists and making threats to the future and hit him with fists and give him a pretty good tune-up. But it was all of that. It was a beat down with fists and threats because he's in the wrong gang and in the wrong neighborhood. And his reaction is as follows, he goes out with people from his own group and he gets a gun. And I cannot forget the glee and joy that he had while he's now going on You Tube prancing around with a gun, pretending to shoot it with the biggest smile on his face, waiting to use this gun. This is his response to a fistfight, was to get a gun.
>
> Then on February 25th, everything went wrong. He is out with his friends, trying to locate his girlfriend A short-lived relationship. This girl over at Schurz High School. Her name is Joslinn [*sic*]. And a car drives by and somehow people in his group think the car might contain other gang members. And, of course, it didn't. It's Mr. Gallegos and people he is with. These aren't gang members. But there's gang signs and talk and things going back and forth. And the driver of the car, unfortunately, just trying to calm – I believe – trying to calm things down, tried to roll down the window, and say, hey, guys, calm down. We are not who you think we are. We are not who you are looking for, and the reaction of Mr. Castejon is to start shooting indiscriminately into a car. And he shot and killed an innocent man, and put the people in the car in great danger. And then he ran away with the gun in hand.
>
> Some of these things were caught on video. Some of these things were described in court. But the fact that you had someone shooting people because of what somebody else did to you is just about unfathomable. Here's the thing, I know he's young, and I know he's trying to say that he's got some remorse. Despite that, I see he's had all kinds of difficulties at the Cook County jail, getting into different situations, including some physical. But his testimony at this trial indicated that if he had to do it all over again, he would have done basically the same thing. That somehow he is trying to tell me from day one and tell the world from day one that he was justified in what he did. That he was beat down. That he thought the people that beat him the other day were the people in that car,

and that's why he did this and he had to protect himself from those people. And it didn't occur to him that he was putting other people at risk because of his carelessness and his itchy finger – he just had to do something with that gun that he had been prancing around with, and it would cause the tragedy it did.

I am mindful of the fact that he is telling me that he would do it all over again, and he was justified, and that's what he testified to at trial, and that's what he's been saying from day one.

\*\*\*

I am mindful of the fact it may be an opportunity for parole hearing after 20 years of being in custody, and I am factoring that in and considering that new statute and circumstance when I fashioned the sentence I just fashioned."

¶ 63　　Finally, defendant argues that the circuit court based its sentencing decision on "misrecollections" of trial evidence. Each of these claimed "mistakes" is without basis. And none were raised below, thus depriving the circuit court of the opportunity to correct or clarify its thinking.

¶ 64　　　　　　　　1. *Judge's Recollection of Defendant's Testimony*

¶ 65　　Defendant takes issue with how the circuit court recalled his testimony. A sentencing judge has the authority to "evaluate a defendant's testimony on the stand" and balance any "willful and material falsehoods" against the defendant's "prospects for rehabilitation." *People v. Singleton*, 124 Ill. App. 3d 386, 399 (1983). Here, the circuit court concluded from defendant's testimony that defendant believed he was justified in what he did and would have done the same thing again. Indeed, that was the *entire* defense theory. It strains credulity for defendant to now complain that his claim of self-defense is anything other than a claim of justification. 2 Wayne R. LaFave, Substantive Criminal Law, § 10.4 (3d ed. 2017) ("One who is not the aggressor in an encounter is *justified* in using a reasonable amount of force against his adversary when he reasonably believes (a) that he is in immediate danger of unlawful bodily harm from his adversary and (b) that the use of such force is necessary to avoid this danger." (Emphasis added.)).

¶ 66                    2. *Characterization of the Fight Video*

¶ 67    Defendant argues that the circuit court mistakenly described a gang altercation video as a "fistfight." In the video, which was taken a few days before the shooting, rival gang members threaten to "ram" defendant with their vehicle, and the video ends on a period of unarmed combat between defendant and the rival gang members. Defendant alleged that after the video ended, he was beaten unconscious. However, defendant never claims his attackers had or used weapons, beyond the possibility he was kicked by someone wearing shoes, and he had no injuries besides a bruise on his leg from an unknown cause. The video shows a fistfight, and defendant described a fistfight.

¶ 68                          3. *The Snapchat Video*

¶ 69    Defendant argues that the circuit court "misrecalled" the Snapchat video in describing defendant with "the biggest smile," because in the video, "Luis barely cracks a smile." In the video, defendant waves a handgun in front of the camera, and he flashes gang signs with a friend while a song in the background references "run[ning] up on me" and advises "bring[ing] a Glock." By his own admission, defendant was making the video for "clout" and to look cool online. The circuit court interpreted defendant's facial expression as a smile, and defendant concedes a smile, but just "barely." At sentencing, the circuit court has the discretion to weigh and to characterize the trial evidence. *People v. Fern*, 189 Ill. 2d 48, 53 (1999) ("A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record."). Accordingly, we cannot say that the

circuit court's characterization of the smile was "clear and obvious error." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 70                                  4. *Judge's Characterization of Jaimes*

¶ 71     Defendant argues that the circuit court's description of Jaimes as a "peacemaker" is mistaken. The circuit court never used the word "peacemaker" but rather described Jaimes as attempting to calm the situation down in the moments before the shooting. This description of Jaimes's actions is consistent with his testimony at trial.

_____

¶ 72     The circuit court balanced mitigating and aggravating factors and fashioned a sentence appropriate to the crimes committed by defendant. There is no basis in this record to reduce defendant's sentence or order a new sentencing hearing.

¶ 73                                  III. CONCLUSION

¶ 74     The judgment of the circuit court of Cook County is affirmed.

¶ 75     Affirmed.

---

*People v. Luis Castejon*, 2022 IL App (1st) 221918

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CR-03911; the Hon. James B. Linn, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, State Appellate Defender, of Chicago (Douglas R. Hoff, Deputy Defender, Michael H. Orenstein, Assistant Appellate Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David H. Iskowich, Susanna Bucaro, Assistant State's Attorneys, of counsel), for the People. |

---